Delbert T. McCONKEY and wife, Opal Ray McConkey, Plaintiffs,

v.

CONTINENTAL INSURANCE COMPANY, Defendant.

Court of Appeals of Tennessee, Eastern Section.

May 22, 1984.

Permission to Appeal Denied by Supreme Court Dec. 31, 1984.

Larry B. Nolen, Athens, for plaintiffs.

Archie R. Carpenter, Knoxville, for defendant.

OPINION

SANDERS, Judge.

Both sides have appealed from the judgment of the court in a suit on a fire insurance policy.

In May, 1982, the Defendant, Continental Insurance Company, issued its policy of insurance to the Plaintiffs, Delbert T. McConkey and wife, insuring their residence against damage by fire in the amount of $40,000, the contents of the residence up to $20,000 and loss of use up to $8,000. On August 6, while the policy was in force, the residence was extensively damaged by fire. Plaintiffs filed a timely proof of loss but the Defendant refused to pay.

The Plaintiffs sued the Defendant for the full coverage of the policy plus 25% bad-faith penalty.

The Defendant, for answer, admitted it had issued its policy on the property and that it was in force on the date of the fire. However, as an affirmative defense, it alleged the Plaintiffs had either set the fire or had procured the setting of it. It also alleged the Plaintiffs had made material misrepresentations concerning the circumstances of the loss, the extent of the loss, and the origin of the loss and that such material misrepresentations voided the policy.

The case was tried before the court without a jury and the court found the issues in favor of the Plaintiffs. He awarded them $34,122 for damages to the house, $7,000 for damages to the contents and $1,500 for living expenses. However, he denied the 25% bad-faith penalty. In his determination of the case, the court said, "With regard to the aspects, the court finds there was certainly evidenced upon which reasonable minds could differ with regard to the claim."

Both sides have appealed. Continental says the court erred in not finding the Plaintiffs had either set the fire or procured its setting. It also says the court erred in not finding the Plaintiffs had made material misrepresentations as to what was in the house at the time of the fire, thereby voiding the coverage. The McConkeys say the court was in error in not finding that the house was totally destroyed by the fire and awarding them $40,000 for its loss. We find merit in the contentions of Continental but we find no merit in the contentions of the McConkeys.

■ We first consider the issue of Continental that the court was in error in failing to find the McConkeys had burned or procured the burning of their house. The McConkeys purchased the property in question in May, 1979, for $25,000. They placed a loan on another piece of property they owned with Liberty Bank for $27,000 and used the funds to pay for the residence. They never made any payments on the loan and the deed of trust was foreclosed by the bank, leaving a deficiency of some $13,000. In January, 1980, the McConkeys conveyed the residence to their son but retained a life estate in it. In September, 1981, a decree was entered in the Chancery Court of McMinn County setting the conveyance of the property to the McConkeys' son aside on the grounds the conveyance was made for the purpose of defrauding creditors. The court also impressed a lien on the property in favor of Earl Cate in the amount of $530.50 and of Liberty Bank in the amount of $13,293.04 and provided that in the event the judgment was not paid within 60 days the property would be sold to satisfy the judgment. The judgment was not paid and the fire occurred on Friday, August 6 prior to Monday, August 9 when the house was scheduled to be sold.

On the morning of the fire the McConkeys had left their house sometime between 7:15 and 7:45. The fire was discovered within a few minutes of eight o'clock. The McConkeys stated they locked the doors when they left the place and no fires were in the stove and all appliances were off. When asked how he accounted for the fire, Mr. McConkey's answer was, "I don't know."

The Defendant called as a witness Mr. Cadden, who was an expert with impressive credentials on the origin and nature of fires. Although no evidence of accelerants was found, he testified the fire was of very high intensity. He located the origin of the fire as being at floor level near a closet in the dining room. After testifying in detail as to his findings and as to what he did to eliminate the possibility of an accidental fire such as an electrical short, he concluded the fire had been deliberately set. In this regard, he testified as follows: "There is no other accidental cause available to have started this fire. You have got to take everything into consideration when you are looking at a fire of this magnitude; that is, how did the fire spread at floor level over a pretty good area of the floor; how did it generate enough heat to burn, you know, clear through the roof and produce the type of heat you had in the house. It was clearly my opinion this was a set fire. There was no indication otherwise. There was no physical indication otherwise other than a set fire, and all other accidental causes were eliminated."

The Plaintiffs offered no proof to indicate the fire started other than in the manner in which Mr. Cadden testified it did.

Both Mr. and Mrs. McConkey gave rather lengthy sworn statements in the nature of questions and answers before the trial and we find many material contradictions in the statements given before trial and the testimony given at trial. The afternoon before the fire Mrs. McConkey sold their dining room suite to Mrs. Womock, one of their neighbors, for $300. When asked about this matter in his sworn statement, Mr. McConkey denied such a sale had been made. He even denied they owned a dining room suite. He said, "We couldn't afford to buy one of them." On trial he admitted he knew about the sale. Mrs. McConkey also sold a rocking chair, a chest of drawers, some dishes and other household items

to Mrs. Hutsell, another neighbor, shortly before the fire. However, Mr. McConkey, in his sworn statement, denied they had sold any furniture. He said, "All she sold was a little end table and some do-dads, you call them," at the flea market. Although both Mr. and Mrs. McConkey stated in their sworn statements they knew the bank was going to sell their house and they were going to have to move, in the trial they both testified they were not aware of this until the day their house was burned.

On the morning of the fire the Plaintiffs went from their home to a flea market where they took a number of items for sale. They were at the flea market at the time they were told their house was on fire. Upon learning of the fire, they loaded the unsold items into their car and returned to the house, but they had sold some $300 worth of items before they left the flea market. Also, the chest of drawers that was sold to Mrs. Hutsell had a number of things in the drawers. These items, including a number of pictures, were removed from the drawers, put in a box and stored in the barn. Mrs. McConkey testified, "Some of the things that was in the barn was some good things, you know, I mean, some things I wanted to keep." There is no explanation in the record as to why these things were stored in the barn instead of the house.

Shortly after arriving at the fire, and while the house was still burning, the Plaintiffs left the scene of the fire and went to the office of their insurance agent to report the fire. They had their fire insurance in the glove compartment of their car. Although Mr. McConkey stated in his sworn statement that they kept their valuable papers in a dresser drawer, Mrs. McConkey testified they kept their valuable papers in their automobile.

We think the testimony of Mrs. Womock, the neighbor who purchased the dining room suite, is very significant. On direct examination she testified as follows:

"Q. Do you recall the day their house burned?

"A. No, I don't remember the date.

"Q. Do you recall it being sometime in August of last year?

"A. Yes, and it was a Friday, the day the house burned.

"Q. All right. Did you talk with Mrs. McConkey the day before the house burned?

"A. Yes, sir.

"Q. What time of day did you first talk to her?

"A. Well, she called me and said that the bank was going to foreclose on her house. She wanted to sell me her dining room suite, and I told her I wasn't interested. I had one.

So later in the day, she called me and asked me if I would come over and look at it. She said she would price it to me. So I went over, and she did price it to me. And I bought it.

"Q. So how many times did she call you that day?

"A. About twice.

"Q. What did she price the dining room set at?

"A. Three hundred dollars.

"Q. Three hundred dollars, is that what you gave for it?

"A. Yes.

"Q. When did you get this dining room suite?

"A. Well, I got it on Thursday before the next morning when the house burned, and I asked her if I could wait until the next morning for me to move it. And she said no, I would have to move it then because she said they were going to the flea market the next morning with a lot of stuff, and they weren't coming back there. She said they were going to her son's, Larry McConkey. So I got my brother, and he helped us move the dining room suite down to my house that Thursday night before the house burned the next morning."

On cross-examination she testified:

"Q. You were living across the street?

"A. Yes, sir.

"Q. And was the dining room suite?

"A.  Yes, sir.

"Q.  All right.  And how did you—did you go down to the house and get it in the daytime or nighttime?

"A.  It was getting dark when we moved it.

"Q.  All right.

"A.  I asked her to wait until the next morning because it was getting dark and so I could get some help to move it.  She said we had to move it that night.  So I got my brother and my grandson and husband and moved it that night.  And it was getting dark.  It was Thursday night before the house burned on Friday."

Aside from the fact that Mrs. McConkey had previously testified that Mrs. Womock had called her inquiring about the dining room suite, Mrs. Womock's testimony is uncontradicted in the record.  It is also interesting to note that the items of furniture sold to Mrs. Hutsell were picked up on the day before the fire.

In the case of *Aetna Casualty and Surety Company v. Parton,* 609 S.W.2d 518 (Tenn.App.1980), under facts similar to those in the case at bar, this court quoted with approval as follows:

" 'When a party in a civil case relies upon circumstantial evidence to make out his case, the facts and circumstances shown by the evidence and relied on to sustain his theory must not only be consistent with that theory, but must also be inconsistent with any other reasonable theory.  However, they need not be so certain as to exclude all other rational theories.  A preponderance of such circumstantial evidence is all that is required in a civil case.  And in civil cases a preponderance of evidence carries the burden of proof regardless of whether the evidence is direct or circumstantial.  A well-connected train of circumstances may outweigh opposing direct testimony.  However, in a civil action, circumstantial evidence which is conflicting is for the trier of facts, governed by the usual rules.'  O'Neil Lee, Tenn. Evidence, p. 338.  Also see *Bryan v. Aetna Life Ins.*

*Co.,* 174 Tenn. 602, 130 S.W.2d 85 and *Pickard v. Berryman,* 24 Tenn.App. 263, 142 S.W.2d 764."

*Id.* 520.

With all of the attending circumstances, why would Mrs. McConkey insist that Mrs. Womock remove the furniture late in the evening when she asked permission to move it the next day and why would she say to Mrs. Womock "they were not going back there"?

We find the evidence preponderates against the holding of the trial court that the evidence failed to show the Plaintiffs had burned or procured the burning of their house.

■  Although our holding on the first issue is dispositive of the case, we also find there is merit in the Defendant's second insistence that the Plaintiffs made material misrepresentations as to the contents of the dwelling at the time of the fire.  The Plaintiffs filed with the Defendant an itemized list of contents of the house at the time of the fire.  The value placed on these contents was in excess of $20,000, which was the limit of their policy.  There was substantial evidence to make the inventory suspect.  For example, the inventory on a clothes closet listed 35 shirts, two three-piece men's suits, six sweaters, 10 dresses, 25 pairs of pants, 13 pairs of shoes, together with a number of other items.  Plaintiffs both testified that the closet was a walk-in closet and was so full they could hardly get into it.  However, Mr. Judson, who was the insurance adjuster, testified he inspected the residence on Monday after the fire on Friday.  He testified he examined the closet in question and he found nothing but the clothes rod with 10 to 15 hangers on it.  His testimony about the closet was, in part, as follows:

"Q.  What did you see in the way of clothing in that closet?

"A.  I didn't see anything in the way of clothing.

"Q.  What did you see in the way of remains in the closet?

"A. I didn't see anything in the way of remains.

"Q. How many—how long have you been in the insurance business, Mr. Judson?

"A. Ten years, a little over ten years.

"Q. How long have you been an adjuster?

"A. Eleven years.

"Q. How much of that time has been spent adjusting and investigating house fires?

"A. Full time.

"Q. How many would you say that you have investigated a year since you started in the business?

"A. At least a thousand.

"Q. A year?

"A. Oh, since the past ten or eleven years.

"Q. The past ten or eleven years. All right.

What—after a fire, what kind of remains of clothing and so forth is evidenced in a normal fire?

"A. You would see if there was any clothing at all, say a shirt that was on a hanger a metal hanger, or a coat or jacket. You would usually see the remains of the cloth or whatever the item was around the neck where the wire folds on the hanger itself.

"Q. All right. How can you tell that the hanger had any clothing on it prior to the fire?

"A. By the remains of the—whatever material is left on the—at least on that portion of the hanger.

"Q. I will ask you if you saw any remains on hangers that are shown in this picture here, Exhibit Number Eighteen?

"A. Not at all.

"Q. What's the—when you say remains are you talking about—describe how the clothing leaves certain remains. What does it look like?

"A. Clothing in reference to the hanger itself, as I have explained, some of the cloth is still evidenced on the neck of the hanger itself. There was nothing to indicate anything on the clothes hangers themselves. Also, sometimes, depending on the size of the garment on the wire hanger—I mean specifically a wire hanger—usually from the heat and the weight of the garment itself, the hanger would give, bend down with the weight as the material is burning. There is no indication there was any weight on the hangers themselves or anything on the neck itself.

"Q. What would you expect to find in a closet, Mr. Judson, that is stacked full of clothes and hangers have sometimes as many as two garments or more on the hangers?

"A. I would expect to find debris at least—with actual rod itself. It was still intact, and the hangers—there was absolutely no distension of the metal itself. Any articles of clothing there would leave a residue."

Mr. Cadden, the fire expert who testified for the Defendant, in speaking about the closet, said:

"Q. Did you look into the closet area of what we have labeled the den here?

"A. Okay. The closet at the end of the den.

"Q. The dining room, excuse me.

"A. Well, the closet that we have labeled at the end of the dining room, I looked in that entire room and the closet. The only thing I noticed of significance, I feel like was that—to me there was a bunch of coat hangers and very few remains of clothing, buttons, zippers, remains of burned cloth, shoe leather, anything of any significance. And the entire room—the remaining portion of the room didn't have any contents in it. There was nothing there at all.

"Q. When you look at clothes hangers and so forth, is there anything in particular you look for after a fire has occurred?

"A. Well, normally you look for the cloth remains. With the new polyester clothes, you will find just gobs of polyester sometimes attached to clothes hangers. You will find black spider webs from burning polyester or synthetics or fabrics. In this case I didn't find any significant amount. I drew

the impression based on what I saw in the closet and my examination of the dining room area that there were no contents at all in that area period."

More important than the Plaintiffs' statement of the contents of the closet, however, are certain items that were claimed to be in the freezer and in the bathroom at the time of the fire. A claim was filed for beef purchased in 1982 at an original cost of $220 and current cost of $600. The Plaintiffs testified they purchased 250 pounds of beef about two weeks before the fire and had eaten only one roast out of it. However, Mr. Judson testified that when he examined the freezer after the fire he found only two packages of ground beef. The Plaintiffs made no effort to explain the absence of the beef from the freezer. Plaintiffs also filed a claim for 125 washcloths at an original cost of $31.25 and a current cost of $50 and 24 bath towels at a cost of $72. Mrs. McConkey testified these items were on a table in the bathroom at the time of the fire. There was no fire damage in the bathroom—only smoke damage. Mr. Judson testified there were no towels or washcloths in the bathroom after the fire. He also said he found the table on which the towels and washcloths were alleged to have been but it was covered with smoke and there was no indication of anything having been on the table during the fire. The policy of insurance, as pertinent here, provides: "We do not provide coverage for any *insured* who has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance."

In his determination of the case the court found the Plaintiffs had "exaggerated" their inventory, and reduced their claim from something in excess of $20,000 to $7,000. In doing this, the court said, "I think there is obviously good testimony from Mr. Judson with regard to what was down there in the house to indicate that the contents claim should not be sustained fully." The court was obviously convinced that all the contents claimed to be in the house were not there, but failed to elaborate further on the issue.

"Policies of fire and property indemnity insurance usually provide that any fraud or false swearing on the part of the insured, whether before or after loss, shall relieve the insurer from liability. Under such a provision, false statements as to material matters wilfully made by the insured in proofs of loss with the intention of thereby deceiving the insurer will preclude any recovery on the policy by the insured; .... This rule is applicable, for example, to the following: an overvaluation of the property insured; ... the inclusion in the proofs of property not destroyed; ....

"If a false statement is knowingly made by the insured with regard to a material matter, the intent to defraud will be inferred..... Furthermore, the insured's knowledge of the falsity of the statements made by him need not be absolute in order to work a forfeiture of his rights under the policy. It is sufficient if he swears with disregard to the truth or swears to matters as true within his knowledge when in fact he knows little or nothing about them."

44 Am.Jur.2d *Insurance* § 1371, p. 299–300.

*Also see Insurance Cos. v. Scales,* 101 Tenn. 628, 49 S.W. 743 (1899); *Insurance Co. v. Connelly,* 104 Tenn. 93, 56 S.W. 828 (1900); *Dossett v. First National Fire Insurance Co.,* 138 Tenn. 551, 198 S.W. 889 (1917); *Trice v. Commercial Union Assurance Company,* 397 F.2d 889 (6th Cir. 1968); *Columbia Horse & Mule Commission Co. v. American Ins. Co.,* 173 F.2d 773 (6th Cir.1949).

Under the facts in the case at bar, we think it should be inferred the Plaintiffs knew their claim for the loss of the beef, washcloths and towels was false, and void any claim under the policy.

The judgment of the trial court is reversed and the complaint dismissed. The cost of this appeal, together with the cost of the trial court, is taxed to the Appellees.

GODDARD and FRANKS, JJ., concur.